In re Application Pursuant to 28 U.S.C. § 1782, Misc. Case No. 16-2552 (BAH)

# EXHIBIT Q

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

In re Application pursuant to
28 U.S.C. § 1782

BSG RESOURCES LIMITED

      Petitioner

                                           Misc. Case No. 16-2552 (BAH)

v.

CHARLES N. BROWER

George Washington University Law School
2000 H Street, NW
Washington, DC 20052

and

MICHAEL DALY

George Washington University Law School
2000 H Street, NW
Washington, DC 20052

      Respondents.

**EXPERT DECLARATION OF GARY B. BORN**

----------------------------------------------------------------------------------------------------

1.     I submit this expert declaration in support of the Opposition to BSG Resources Limited's Petition under 28 U.S.C. § 1782 filed by the Respondents to this action, Judge Charles N. Brower and Michael Daly.

2.     In preparing this declaration, I have reviewed the publicly available filings in this matter. I have not reviewed any materials from the underlying proceeding in the United Kingdom (the U.K. High Court proceeding) or from the London Court of International Arbitration proceeding (the LCIA arbitration), as I understand that those proceedings are being conducted under confidentiality restrictions.

**My Background**

3.     I serve as the Chair of the 70-person International Arbitration Practice Group for Wilmer Cutler Pickering Hale and Dore LLP. Although I am a U.S.-trained lawyer, I am based in the firm's London,

United Kingdom office. For the past 20 years, I have been ranked as one of the world's leading international arbitration practitioners and the leading arbitration practitioner in London.  I have participated in more than 650 international arbitrations, and I have sat as arbitrator (presiding arbitrator, sole arbitrator or co-arbitrator) in more than 200 institutional and *ad hoc* arbitrations.

4.      I am the author of *International Commercial Arbitration* (Kluwer 2d ed. 2014), the leading treatise in the field.  The second edition of the treatise is a 4,500-page work, in three volumes, providing a comprehensive commentary on all aspects of the international commercial arbitration process. It references more than 20,000 awards, judicial decisions, and other authorities.  My treatise is cited regularly by national courts, including the U.S. Supreme Court.[1]

5.      I am also the author of International Arbitration: Law and Practice (2012); International Arbitration and Forum Selection Agreements: Drafting and Enforcing (4th ed. 2013); International Arbitration: Cases and Materials (2011) and International Commercial Arbitration: Commentary and Materials (2nd ed. 2001). I am also the author (together with Peter Rutledge) of International Civil Litigation in United States Courts (5th ed. 2011). Various of these publications have received a number of professional or academic distinctions.

6.      I am the current President of the Singapore International Arbitration Centre (SIAC) Court of Arbitration.

7.      Because the instant dispute before the Court focuses, in part, on the role of an arbitral tribunal secretary and the analogous role of a law clerk, I wish to point out that I have worked with a large number of tribunal secretaries in my capacity as an arbitrator. Also, earlier in my career, I also served as a law clerk for the Honorable Henry J. Friendly (U.S. Court of Appeals for the Second Circuit) and for the Honorable William H. Rehnquist (U.S. Supreme Court).

8.      For additional information concerning my background, please refer to the attached copy of my detailed CV.

**Scope of Declaration**

9.      This declaration will address five subjects: (1) The role of an arbitral tribunal secretary; (2) the background and rationale for immunity of arbitrators; (3) the confidentiality of the arbitral tribunal's deliberations; (4) the nature of 28 U.S.C. § 1782; and (5) the policy implications at stake in this action.

**Part 1: The Role of an Arbitral Tribunal Secretary**

---

[1] *See, e.g.*, *BG Grp, Inc. v. Argentina*, 134 S. Ct. 1198, 1211, 1218, 1221, 1223 (2014).

10.    Together with the robust growth of international arbitration as a trusted dispute resolution mechanism over the past few decades, the nature of arbitral disputes has become increasingly complex.  A contemporary high-value commercial dispute very frequently includes an extensive record.  A case may involve thousands or even millions of pages of correspondence, submissions, orders, witness statements, expert reports, legal opinions, documentary evidence, translations, hearing transcripts, and the like.  It is no surprise, therefore, that today's arbitrators often rely on assistance from others to help them carry out their duties in the most efficient and cost-effective manner.

11.    A busy arbitrator can look to his or her office support staff to fill that role to a certain extent.  An office secretary or administrative assistant may handle photocopying, mail services, printing, typing, scanning, and other clerical tasks.  For such chores, no legal training is required.

12.    But most arbitrators also seek additional support from someone with a formal legal education, usually termed a tribunal secretary. Typically a younger lawyer, and often one from the presiding arbitrator's law firm or barristers chambers, the tribunal secretary is tasked with overseeing the day-to-day developments of a particular arbitration — and doing so from the learned perspective of a trained lawyer.

13.    Most tribunals prefer to hire a tribunal secretary already reasonably well versed in the practice and parlance of international arbitration. It saves the tribunal significant time if the tribunal secretary, for example, is familiar with the relevant procedural rules, knows the ins and outs of the hearing venue, and understands the meaning of arbitration "terms of art," such as "Redfern schedule," "Skeleton Submission, and "terms of reference."

14.    To meet the large demand for competent tribunal secretaries, an ever-increasing pool of talented lawyers has formed in recent years. Virtually all of them have completed their law degrees, and some of them have gone on to attain a PhD or SJD or other, equivalent higher degree.    Many of them offer years of experience practicing international arbitration for top tier law firms or government agencies. Most would be considered seasoned professionals — typically beyond their early twenties in terms of age, and often already well into their thirties or even forties.  Institutions like the International Centre for the Settlement of Investment Disputes (ICSID) and the Permanent Court of Arbitration (PCA) offer a stable of such candidates, all with excellent credentials, who can serve as a tribunal secretary for a dispute administered by that institution.

15.     Most arbitral institutions require that a tribunal seek the consent of the parties to a dispute as a condition to appointing a proposed tribunal secretary.  At that time, the tribunal typically will introduce the candidate, circulate his or her resume, address any potential conflicts of interest, and explain that the appointment of the candidate will assist the tribunal to function efficiently while minimizing its costs.  If either party wishes to lodge an objection or request that any special procedures be put into place with respect to the tribunal secretary, that party must do so during the appointment process.

16.     In terms of duties, a tribunal secretary often fulfills a role very similar to that of a law clerk for a judge.  Arbitrators may ask the tribunal secretary to undertake some purely clerical tasks — typing, organizing files, etc.  But in many cases, the tribunal secretary will also take on non-administrative responsibilities.  My treatise elaborates:

> [I]t is common practice for secretaries (or other junior lawyers) to conduct legal research for tribunals, to organize files and witness statements (sometimes going beyond merely administrative work) and sometimes to draft portions of awards. Obviously, the latter tasks can, if not carefully monitored and checked, risk inappropriately involving a secretary or other junior lawyer in the tribunal's deliberations or decision-making. Nevertheless, the better view is that there is no per se prohibition on secretaries or junior lawyers performing such tasks, provided that the members of the tribunal carefully review and make appropriate use of any preparatory work.[2]

17.     Recent years have seen appropriate debate within the international arbitration community concerning the scope of a tribunal secretary's responsibilities.  To that end, I offer three observations.

a.     One, I think it plain that an arbitrator should never delegate his or her ultimate decision-making authority to a tribunal secretary, or to any other person for that matter.  There is no real dispute here.  Ethical guidelines, national laws, institutional rules, and commentary are all consistent on this point.  Included within the arbitrator's mandate are all the essential duties of attending hearings and deliberations, evaluating the parties' positions, reviewing the evidence, and deciding how to resolve the dispute.  The arbitrator alone must fulfill those obligations, just as a judge alone must fulfill these responsibilities in most legal systems.

---

[2] GARY B. BORN, INTERNATIONAL COMMERCIAL ARBITRATION 1999 (2d ed. 2014); see also Nigel Rawding et al., International Arbitration in England: A Procedural Overview, in ARBITRATION IN ENGLAND, WITH CHAPTERS ON SCOTLAND AND IRELAND 368 (Julian D. M. Lew et al. eds. 2013).

b. Two, consistent with the foundational framework of arbitration as grounded in party consent, the role of a tribunal secretary depends ultimately upon the agreement of the parties to the dispute. In theory, the parties may expressly specify that a tribunal secretary's role shall be limited to certain select responsibilities. Conversely, and rarely, the parties might agree that a tribunal secretary may exercise decision-making authority over selected issues of ancillary nature.[3] The guiding principle remains the same. The parties are free to agree upon the use and role of the tribunal secretary.

c. Third, absent agreement by the parties, the role of a tribunal secretary is subject to the arbitral tribunal's procedural discretion, provided that the arbitrator(s) retain their ultimate decision-making authority. It is elementary that the arbitral tribunal possesses broad procedural discretion over the conduct of the arbitral proceedings.[4] That procedural discretion extends to the use and definition of a tribunal secretary (absent contrary agreement by the parties). Again absent contrary agreement, the same conclusion is also reached by way of the parties' implied intentions, based upon the customary practice of use of tribunal secretaries in international arbitration.

18. Expanding upon the latter two observations, any party seeking to impose specific parameters on the role of a tribunal secretary, or seeking to create special protocols for how the tribunal should employ the secretary, must raise the issue at the outset of a dispute, preferably during the tribunal secretary's appointment process. Unless both parties agree to revisit the role of the secretary (thereby establishing party consent), an arbitral tribunal may engage its secretary in whatever manner it sees fit, as long as the arbitrators retain their ultimate decision-making authority. If a party first expresses a concern about the secretary well into the arbitration — and especially if it only does so after finding itself on the receiving end of an adverse ruling — that party's complaint will in practice seldom be given effect and, in my view, should be regarded as having been waived.

---

[3] For such an example, see *AES Summit Generation Limited AES-Tisza Erömü v. Hungary*, ICSID Case No. ARB/07/22, Award (Sept. 23, 2010) ¶ 3.29 ("[I]t was agreed by the parties and the Tribunal [in the document production phase of an arbitration] that any disagreement between the parties on any redactions proposed by the Respondent would be submitted to the Secretary of the Tribunal for decision, without recourse to the Tribunal. Following a number of written exchanges between the parties regarding proposed redactions by the Respondent, the parties invited the Secretary's decision.").

[4] *See, e.g.*, Born, *supra* note 2, at 2144; UNCITRAL Model Law on International Commercial Arbitration, Article 19(2) ("Failing such agreement [by the parties], the arbitral tribunal may, subject to the provisions of this Law, conduct the arbitration in such manner as it considers appropriate.").

19.     It should be self-evident that any communication between a member of an arbitral tribunal and a tribunal secretary concerning any aspect of the arbitration falls within the definition of tribunal "deliberations." This conclusion applies even if the communication runs only between one arbitrator (*e.g.*, the presiding arbitrator) and the tribunal secretary, without copying the other members of the tribunal.   In practice, presiding arbitrators often must and will initiate the deliberative process — with appropriate assistance, as needed, from the tribunal secretary — by fostering discussion, preparing memoranda, circulating points for debate, and drafting a decision for review.

20.     The tribunal secretary is part and parcel of that deliberative process, though not in any sense having any "deciding" role whatsoever.   He or she will necessarily be aware of the tribunal's focus, their points of disagreement, the particular concerns of any one arbitrator, and so on.  It is precisely because the tribunal secretary has been trained in the laws and procedures of arbitration (unlike administrative support personnel) that he or she is privy to the deliberative process and adds knowledgeable support to the tribunal during that process. In my view, it would (and should) come as no surprise to any party operating under the rules of a well-known arbitral institution such as the LCIA that a tribunal secretary would be exposed to all aspects of tribunal deliberations.

21.     I am aware that the LCIA's "Notes to Arbitrators" (the "Note") addresses the role of tribunal secretaries.  Among other things, the Note states that "the duties of the tribunal secretary should … no[t] constitute any delegation of the Arbitral Tribunal's authority."[5]  It also suggests that tribunal secretaries "confine their activities to such matters as organizing papers for the Arbitral Tribunal, highlighting relevant legal authorities, maintaining factual chronologies, reserving hearing rooms, and sending correspondence on behalf of the Arbitral Tribunal."[6]

22.      The Note does not form part of the LCIA Rules themselves and is instead intended as guidance to tribunals, providing a non-exclusive list of tasks which can usefully be performed by secretaries.[7]  As I have explained above, the conduct of the arbitration is still governed by the parties' agreement or, in the absence of such agreement, the tribunal's discretion, provided that the tribunal retains its ultimate decision-making authority.  In my view, it is entirely appropriate for the tribunal secretary to engage in activities beyond those described in the Notes, so long as the parties have not agreed otherwise.

---

[5] LCIA Notes for Arbitrators, dated 29 June 2015, at para 69.  The Note was issued after the commencement of the LCIA arbitration and long after Mr. Daly was appointed as Tribunal Secretary.

[6] *Id.* at para. 71.

[7] *Id.* at para. 1 ("The purpose of this note is to provide guidance to arbitrators conducting arbitrations in accordance with the LCIA Rules.").

Tasks such as conducting legal research, organizing files and witness statements and drafting portions of awards are all undertaken by the secretary to assist the tribunal in its deliberations, and do not constitute any delegation by the tribunal of its ultimate decision-making authority.

## Part 2: Background and Rationale for Immunity of Arbitrators

23.     As I have explained, arbitrators perform adjudicative functions, much like national court judges. [8]   As a consequence, like judges, arbitrators and arbitral institutions have also long enjoyed quasi-judicial immunities.

24.     The adjudicative function of international arbitrators has long and uniformly been recognized.  In the words of the U.K. Supreme Court:

> A more modern source, Gary B Born's authoritative work on International Commercial Arbitration (2009), convincingly discusses the general international legal understanding of the nature of an arbitrator's engagement in the following passage (Vol I, pp 1607-1609):
> …
> "Equally, regarding the arbitrator as a service provider, like an accountant, investment banker, lawyer, or other professional, ignores the essential adjudicative character of his or her mandate. Arbitrators do not merely provide the parties with a service, but also serve a public, adjudicatory function that cannot be entirely equated with the provision of service in a commercial relationship. The proper analysis is therefore to regard the arbitrator's contract as a sui generis agreement specifying the terms on which this adjudicative function is to be exercised vis-à-vis particular parties and on particular terms."[9]

25.     A consequence, both logical and functional, of the arbitrator's adjudicative function is the arbitrator's immunity.  This quasi-judicial immunity is recognized in virtually all legal systems, including the United States.

26.     I am aware that the District of Columbia's Arbitration Act offers broad protections of immunity on behalf of arbitrators:

> § 16-4414. IMMUNITY OF ARBITRATOR; COMPETENCY TO TESTIFY; ATTORNEY'S FEES AND COSTS.

---

[8] Born, *supra* note 2, at 1985-86.
[9] Jivraj v. Hashwani, [2011] UKSC 40, para. 77.

*(a) An arbitrator is immune from civil liability to the same extent as a judge of a court of the District of Columbia acting in a judicial capacity.*

*(b) The immunity afforded by this section supplements any immunity under other law.*

*(c) The failure of an arbitrator to make a disclosure required by § 16-4412 does not cause any loss of immunity under this section.*

*(d) In a judicial, administrative, or similar proceeding, an arbitrator is not competent to testify, and may not be required to produce records as to any statement, conduct, decision, or ruling occurring during the arbitration proceeding, to the same extent as a judge of a court of the District of Columbia acting in a judicial capacity. This subsection does not apply:*

> *(1) To the extent necessary to determine the claim of an arbitrator against a party to the arbitration proceeding; or*

> *(2) To a hearing on a motion to vacate an award under § 16-4423(a)(1) or (2) if the movant establishes prima facie that a ground for vacating the award exists.*

*(e) If a person commences a civil action against an arbitrator arising from the services of the arbitrator or if a person seeks to compel an arbitrator to testify or produce records in violation of subsection (d) of this section, and the court decides that the arbitrator is immune from civil liability or that the arbitrator is not competent to testify, the court shall award to the arbitrator reasonable attorney's fees and other reasonable expenses of litigation.*

27. This provision finds its roots in long-standing traditions of judicial immunity in both the United States and the United Kingdom.

28. Common law jurisdictions, such as England and the United States, historically have shielded judges from liability and from having to testify or disclose evidence in relation to their judicial duties. Because arbitrators perform functions similar to judges, they, too, are entitled to immunity when acting within their quasi-judicial capacity.

29.    The U.S. Supreme Court first recognized the immunity of judges in an 1871 opinion issued in *Bradley v. Fisher.*[10]  The lower courts began extending the same protections to arbitrators in subsequent years, beginning with an 1880 opinion from the Iowa Supreme Court in *Jones v. Brown.*[11]

30.    A leading commentator, Professor of Law Susan Franck, explains that the justification for affording arbitrators immunity under U.S. law stems from the similarity between arbitrators and judges:

> *In essence, rather than focusing upon the terms of an arbitrator's appointment to establish the scope of liability, the limitation of liability is justified because of an arbitrator's status and functional similarity to judges. Particularly within common law jurisdictions, courts appear willing to extend immunity to arbitrators when they are acting in a quasi-judicial capacity since arbitrators are in much the same position as judges, in that they carry out more or less the same functions. As with the Administrative Law Judges who gained immunity in Butz, individuals trying to make principled decisions should be immune from suit because of the special nature of their responsibilities.*
>
> *In the United States, when arbitrators assume responsibilities that are functionally comparable to those of judges, they receive immunity. . . . [The] functional similarity to a judge depends upon (i) whether a dispute exists, (ii) whether there is an ultimate determination of liability, and (iii) whether the decision-maker conducts a hearing and takes evidence from the parties, as would a judge.*[12]

31.    I make similar observations in my treatise:

> *In the United States, there is a long history of arbitrator immunity, dating to at least as early as the mid-19th century.  In these decisions, U.S. courts have reasoned that arbitrators should be granted virtually absolute immunity because of their adjudicative function:*

---

[10] 80 U.S. (13 Wall.) 335, 337, 341 (1871) ("No court can administer justice or live if its judges are to be threatened with personal chastisement on all occasions whenever the irascibility of counsel may be excited by imaginary insult. . . .  Judges of courts of record of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly.").

[11] 6 N.W. 140, 142-43 (Iowa 1880).

[12] Susan D. Franck, *The Liability of International Arbitrators: A Comparative Analysis and Proposal for Qualified Immunity*, 20 N.Y.L. SCH. J. INT'L & COMP. L. 1, 18-19 (2000) (internal citations and quotation marks omitted).

> *"An arbitrator is a quasi-judicial officer…exercising judicial functions. There is as much reason in his case for protecting and insuring his impartiality, independence, and freedom from undue influence, as in the case of a judge or juror."[13]*

32.   The tradition of immunity for arbitrators dovetails with the pro-arbitration stance taken by United States courts consistently over the last several decades.[14]

33.   Furthermore, under U.S. law, arbitral immunity extends beyond arbitrators to "protect[] all acts within the scope of the arbitral process,"[15] including organizations that sponsor arbitrations, such as the American Arbitration Association.[16]

34.   Arbitration in England traces its roots much earlier than the United States.[17] Based on its sterling reputation as a center for international business transactions, London has served as a long-standing, trusted seat for international arbitration.  A number of institutions catering to the international arbitral community were established in London.  Among them are the LCIA, which finds its origins in the nineteenth century, making it the world's oldest arbitration institution, and the Chartered Institute of Arbitrators, which was founded in 1915 and has gained an international presence in more than 100 countries with more than 12,000 professionally qualified members around the world.[18]

35.   The immunity of arbitrators is codified most recently in Section 29 of English Arbitration Act, 1996:

---

[13] Born, *supra* note 2, at 2028 (*quoting Hoosac Tunnel Dock & Elevator Co. v. O'Brien*, 137 Mass. 424, 426 (Mass. 1884)).

[14] *See, e.g., CompuCreditCorp. v. Greenwood*, 132 S. Ct. 665, 669 (2012)*; Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, 447-49 (2006); *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219-220 (1985); *Mitsubishi Motors Corp. v. Soler Chrysler*, 473 U.S. 614, 626 (1985); *Moses H. Cone Mem'l Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 24-25 (1983).

[15] *Austern v. Chicago Bd. Options Exch., Inc.*, 898 F.2d 882, 886 (2d Cir. 1990).

[16] *See, e.g., Owens v. American Arbitration Ass'n, Inc.*, No. 16–1055, 2016 WL 6818858, *2 (8th Cir. Nov. 18, 2016); *Olsen v. National Ass'n of Securities Dealers*, 85 F.3d 381, 382-83 (8th Cir. 1996); *Shrader v. NASD, Inc.*, 855 F.Supp. 122, 124 (E.D.N.C.1994), *aff'd*, 54 F.3d 774 (4th Cir. 1995) (unpublished per curiam); *Corey v. New York Stock Exch.*, 691 F.2d 1205, 1209 (6th Cir. 1982); *Cort v. American Arbitration Ass'n*, 795 F.Supp. 970, 972–73 (N.D. Cal. 1992).

[17] Julian D. M. Lew & Melissa Holm, *Development of the Arbitral System in England*, *in* ARBITRATION IN ENGLAND, WITH CHAPTERS ON SCOTLAND AND IRELAND 1 (Julian D. M. Lew et al. eds. 2013).

[18] Julio César Betancourt & Tony Marks, *The Chartered Institute of Arbitrators*, *in* ARBITRATION IN ENGLAND, WITH CHAPTERS ON SCOTLAND AND IRELAND 74 (Julian D. M. Lew et al. eds. 2013).

*Immunity of Arbitrator*

*(1) An arbitrator is not liable for anything done or omitted in the discharge or purported discharge of his functions as arbitrator unless the act or omission is shown to have been in bad faith.*

*(2) Subsection (1) applies to an employee or agent of an arbitrator as it applies to the arbitrator himself.*

*(3) This section does not affect any liability incurred by an arbitrator by reason of his resigning.*

36.     Subsection (2) makes clear that as an employee or agent of the arbitrator(s), the tribunal secretary is as immune as a member of an arbitral tribunal.

37.     The seminal treatise on English arbitration, *Mustill & Boyd* (which predates the current English Arbitration Act), explains the rationale behind the doctrine of immunity under English law:

> *All arbitrators are entitled to immunity . . . when performing a judicial function.  The primary characteristic of such a function is that the person who performs it is required to adjudicate upon an existing formulated dispute.  But there are other matters which help to show whether or not the person in question is acting judicially; in particular, whether he receives evidence and arguments from the parties.  Weight must also be given to the terms of the contract under, or in relation to which, he is appointed.[19]*

38.     In my view, these observations are correct and reflect the law (and practice) in virtually all developed jurisdictions around the world.

**Part 3: Confidentiality of Arbitral Deliberations**

39.     In addition to the doctrine of immunity, there is also a doctrine protecting the confidentiality of arbitral deliberations.    As explained in my treatise, arbitral deliberations are sacrosanct and the definition of "deliberations" must be construed broadly in this regard:

> *The confidentiality of the arbitral deliberations is central to the adjudicative character and integrity of the arbitral process. In the words of one author, the rule that arbitral deliberations remain secret is "a fundamental principle*

---

[19] SIR MICHAEL J. MUSTILL & STEWART C. BOYD, THE LAW AND PRACTICE OF COMMERCIAL ARBITRATION IN ENGLAND 226-27 (1989); *see also* Franck, *supra* note 12, at 21, 32-35.

*which constitutes one of the mainsprings of arbitration, as it does of all judicial decisions."*

*Although seldom addressed specifically in applicable rules or legislation, the confidentiality of the arbitrators' deliberations should extend generally to draft awards, internal communications regarding disposition of a case or comments on draft awards, and the content of oral deliberations. Thus:*

*"A rule of confidentiality of the deliberations must, if it is to be effective, apply generally to the deliberation stage of the tribunal's proceedings and cannot realistically be confined to what is said in a formal meeting of all the members in the deliberation room. The form or forms the deliberations take varies greatly from one tribunal to another. Anybody who has had experience of courts and tribunals knows perfectly well that much of the deliberation work, even in courts like the ICJ which have formal rules governing the deliberation, is done less formally.... Revelations of such informal discussion and of suggestions made, could be very damaging and seriously threaten the whole deliberation process."[20]*

40.    Other leading arbitration treatises confirm the same. For example:

*The confidentiality of the arbitral process is both an obligation imposed upon the arbitrators and a right they can exercise vis-à-vis the parties, any arbitral institution that is involved, and even, subject to review by the courts, third parties.  It is also a prerogative inherent in their judicial function, as is the case with the rule that all deliberations between the arbitrators must remain confidential.[21]*

41.    And another example:

*Arbitrators are generally understood to bear a duty of confidentiality.  They will be expected to keep confidential the names of the parties, the details of the matter, the proceedings and the deliberations of the tribunal. These are not obligations that arise specifically under English law but are general principles of*

---

[20] Born, *supra* note 2, at 2809 (quoting M. de Boisséson, *Le droit français de l' arbitrage national et international* ¶ 343 (1990) and *Challenge Decision of the Appointing Authority, Sir Robert Jennings, on the Challenge of Judge Bengt Broms in IUSCT Case of 7 May 2001*, 38 Iran-US C.T.R. 386 (2001)).

[21] FOUCHARD GAILLARD GOLDMAN ON INTERNATIONAL COMMERCIAL ARBITRATION, 626–27 § 1167 (Emmanuel Gaillard & John Savage, eds. 1999).

> *international arbitration law and practice, which arguably bind all arbitrators, including those in English arbitrations.[22]*

42.     In fact, the secrecy of deliberations is a fundamental feature of English law dating to the emergence of juries after the Norman Conquest, and a tradition that remained intact in the American colonies and has extended to the present time in both jurisdictions.[23]

43.     As detailed in my treatise, the critical doctrine of confidentiality protecting arbitral deliberations from disclosure to third parties is woven into a larger patchwork of laws and guidelines far beyond those relevant to the action before this Court.   Many national arbitration statutes contain provisions expressly requiring that the deliberations among the members of the arbitral tribunal be treated as confidential. [24]   Even when not express, national law may impliedly impose the same obligations of confidentiality on arbitrators.[25] The same obligations of confidentiality are imposed by ethical and professional guidelines for the conduct of international arbitrators.[26]

44.     Like the LCIA, most institutional arbitration rules provide expressly for confidentiality of the arbitrators' deliberations.[27]  To illustrate, I have included a chart of select provisions from arbitral institutions around the world as Annex A to this declaration.

45.     Considering all of the above, it is axiomatic that neither an arbitrator nor a tribunal secretary should be compelled to disclose any communication between them concerning the arbitration to one of the parties to an arbitration, or to any third party whatsoever.  To do so would be to undercut decades, and even centuries, of laws, rules, and policies established to protect the sanctity of tribunal deliberations.

## Part 4: The Nature of 28 U.S.C. § 1782

46.     The conclusion and purposes set forth in the preceding paragraph are consistent with the nature of 28 U.S.C. § 1782.

---

[22] Julian D. M. Lew, *Confidentiality in Arbitrations in England, in* ARBITRATION IN ENGLAND, WITH CHAPTERS ON SCOTLAND AND IRELAND 451 (Julian D. M. Lew et al. eds. 2013).

[23] *See* Diane E. Courselle, *Struggling with Deliberative Secrecy, Jury Independence, and Jury Reform,* 57 S.C. L. REV. 203, 214-17 (2005).

[24] Born, *supra* note 2, at 2808 & n.141.

[25] Born, *supra* note 2, at 2808 & n.142.

[26] Born, *supra* note 2, at 2808-09 & n.144.

[27] Born, *supra* note 2, at 2808 & n.143.

47.     Although other national arbitration regimes also provide judicial assistance in the taking of evidence to assist international arbitrations, the United States offers a unique statutory scheme. It does so in the form of 28 U.S.C. § 1782.  The analysis for a U.S. court to analyze a § 1782 petition is set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).

48.     I understand that the Respondents in this action oppose BSGR's § 1782 petition according to the test laid out in *Intel*.  I agree with their conclusion that the Court should deny BSGR's petition in its entirety, although I will not opine on each aspect of *Intel* as applied to the distinct facts of this case because I have not been provided with access to the complete record other than the documents already publicly available on the Court's online docket.

49.     Instead, I will limit my analysis here to a brief explanation concerning the nature of 28 U.S.C. § 1782.  If a party to an arbitration were permitted to invoke 28 U.S.C. § 1782 and thereby compel an arbitrator or a tribunal secretary to disclose their communications concerning the arbitration, it would be inconsistent with the statute and would do violence to the entire purpose underlying the law.

50.     I am of the opinion that U.S. courts considering a § 1782 petition should attach substantial weight to the "foreign" arbitral tribunal's views regarding U.S. judicial assistance.   Absent exceptional circumstances, the U.S. court should not provide any assistance under the statute when the arbitral tribunal itself — as distinguished from one or more of the parties before the arbitral tribunal — has not endorsed the discovery request.  As set forth in my treatise:

> *Despite the provision's expansive text, the authority granted by §1782 should generally not be exercised to grant discovery applications by a party to foreign arbitral proceedings, except where that request is supported by the tribunal in the arbitral proceeding. . . .*
>
> *Except in rare cases, party-initiated discovery in U.S. courts under §1782 has substantial potential to delay and complicate arbitral proceedings, and to violate the parties' basic commitment, in their arbitration agreement, to forego dispute resolution mechanisms outside the arbitral process. These risks are particularly serious where a U.S. court is asked by a party – without the approval of the arbitral tribunal – to "assist" a foreign arbitration.*[28]

51.     The essence of a § 1782 petition is *facilitation* of the arbitral process and *assistance* to that process — not obstruction of the process.

This is consistent with Article 27 of the UNCITRAL Model Law, which provides "the arbitral tribunal or a party with the approval of the arbitral tribunal may request from a competent court of this State assistance in taking evidence."[29] Thus far, U.S. courts have applied the statute in a consistent manner that has resulted in sensible decisions by lower courts, which genuinely aid the arbitral process and do not produce unnecessary delay, expense, or interference with the arbitrators' control over disclosure and evidence-taking.

52.     BSGR's § 1782 petition represents an unprecedented departure from all prior usage of 28 U.S.C. § 1782.  I have never heard of another instance in which a party to an arbitration successfully sought relief under the statute as a means to remove arbitrators from a standing tribunal.  Nor have I ever encountered an attempt — which is even more extraordinary — by a party to seek evidence of an arbitral tribunal's deliberations by virtue of the statute.  This usage of the § 1782 cannot be proper by any stretch of the imagination.

53.     BSGR's application is not faithful to the foundational policies underlying 28 U.S.C. § 1782.  In fact, it contradicts and makes a mockery of those principles.   Rather than facilitate the LCIA arbitration, BSGR's application invokes § 1782 precisely for the opposite purpose, namely to dismantle arbitration.  BSGR elected of its own accord to resolve its disputes with Vale through arbitration. It cannot now thwart the arbitral process through this application. Section 1782 exists to foster arbitration globally.  The spirit of the law sits in harmony with the more general approach by U.S. courts to promote and favor arbitration as a dispute resolution mechanism. Yet BSGR's petition invites this Court to stand the statute on its head and use it as a conduit through which to kill an ongoing international arbitration.

**Part 5: The Policy Implications at Stake in this Action**

54.     Finally, I believe it is important briefly to note the larger implications of the issues posed by the § 1782 petition before this Court.

55.     Were a U.S. (or other) court to ignore the vital doctrine of confidentiality as applied to arbitrators and arbitral institutions, and compel arbitrators (or tribunal secretaries) to disclose evidence of tribunal deliberations, that court would open the proverbial "Pandora's box."  The chilling effect upon arbitral deliberations would be profound.   Consider the fragile dynamic underlying an international arbitral tribunal composed of individuals scattered across the globe.  The difference in time zones between arbitrators poses obvious difficulties for holding deliberations in person. Telephone and video conference options are available, but email provides     the     most     reasonable     and     common     means     of

---

[29] UNCITRAL Model Law on International Commercial Arbitration, Article 27.

communication.  Were a U.S. (or other) court to grant an order as contemplated by BSGR's petition, any reasonable arbitrator would think twice before engaging in free, robust, and unencumbered email communications with the other members of the tribunal for fear of seeing that communication disclosed to an arbitral party in the future as a result of a subpoena.

56.     It is no exaggeration to note that the current robust global system of international arbitration would be exposed to serious risks in the face of court orders compelling arbitrators to open their files to the parties before them.  BSGR's proposal would invite parties to lodge evidentiary battles  against arbitrators in U.S. courts at the hint of any unfavorable ruling.  It would result in a priming effect, depriving arbitrators of their confidence and ability to manage cases.  It would also stymie Congress's purpose in enacting 28 U.S.C. § 1782, which, as reflected in the statutory title itself, is to give "*Assistance* to foreign and international tribunals." (emphasis added).

57.     Lest we forget, the vast majority of arbitrators sitting in commercial arbitrations are private citizens.  Unlike national judges, they do not report to a courthouse, nor do they enjoy the refuge of the U.S. Marshal service, governmentally protected email servers, and private elevators.  They are more vulnerable to fear and intimidation generated by a disgruntled litigant than a judge might be.  Besides professional liability insurance, the doctrine of judicial immunity stands as the principal defense available to an arbitrator.  Without immunity, the integrity of the arbitral system as a private dispute resolution mechanism would be compromised.

58.     I agreed to provide this declaration because I endorse the Respondents' position.  But I also agreed because the doctrine of confidentiality and types of immunity protections enshrined in laws such as the District of Columbia Arbitration Act and the English Arbitration Act are as important now as ever before.  In recent years, litigious parties to arbitrations that are dissatisfied with the result or the proceeding, or indeed even the direction of the proceeding, sometimes throw caution to the wind and employ any possible "guerilla" tactic, including ancillary litigation or intimidation, to achieve a certain result.

59.     Two months ago, two other observers, Lucy Reed and Bernardo Cremades,[30] echoed this viewpoint:

---

[30] Ms. Reed is the former co-head of global international arbitration and public international law groups at Freshfields Bruckhaus Deringer and is currently the Director for the Centre of International Law at the National University of Singapore.  Mr. Cremades a leading Spanish international arbitration practitioner based in Madrid and Professor of International Business Law at Universidad de Madrid.

a. Delivering the annual Freshfields lecture, Ms. Reed remarked after 35 plus years in international arbitration that she now observes a marked increase in parties using due process arguments abusively as a sword rather than as a shield.  The typical pattern, according to her, features an unreasonable claim of a "due process violation" that the party repeats and amplifies to intensify pressure on an arbitrator.  Even an illegitimate claim can create a perception of illegitimacy that the arbitrator can do little to dispel.  The "routine, often incessant and shrill invocation of multiple procedural complaints under the banner of due process" can intimidate arbitrators into doing something a certain way or wear them down to one side's advantage.[31]

b. Bernardo Cremades used the recent Chartered Institute of Arbitrators' Alexander Lecture also to highlight the abuse of due process in international arbitration.  Among other things, he commented that counsel increasingly raise questions of due process in a threatening way to make arbitral tribunals "weak" and "fearful of the aggressiveness of the parties' lawyers."   He characterized the trend as part of a growing movement away from gentlemanly conduct by counsel and embrace of "aggressiveness" as a virtue.[32]

60. National courts play a vital role in protecting the international arbitral process.  While courts could exist without international arbitration, international arbitration most certainly could not exist without national courts.  In my view, it is essential to have regard to these critical policy objectives.

**Conclusion**

61. For all of the reasons stated above, I urge the Court to deny BSGR's § 1782 petition in its entirety.

---

[31] Alison Ross, *Reed Condemns Trump Approach to Due Process*, GLOBAL ARBITRATION REVIEW (Nov. 1, 2016).

[32] Alison Ross, *Second Leading Arbitrator Highlights Due Process Threat*, GLOBAL ARBITRATION REVIEW (Nov. 17, 2016).

17 January 2017

_____           _____

Gary B. Born                                    Date

**Annex A**

| Rule / Guideline | Quote |
|---|---|
| **American Arbitration Association, Commercial Arbitration Rules (2013)**, Rule 52(d)-(e) | "(d)  Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.<br><br>(e)  Parties to an arbitration under these rules may not call the arbitrator, the AAA, or AAA employees as a witness in litigation or any other proceeding relating to the arbitration. The arbitrator, the AAA and AAA employees are not competent to testify as witnesses in any such proceeding." |
| **American Arbitration Association / American Bar Association, The Code of Ethics for Arbitrators in Commercial Disputes (2004)**, Canon VI(B)–(C) | "B.  The arbitrator should keep confidential all matters relating to the arbitration proceedings and decision. An arbitrator may obtain help from an associate, a research assistant or other persons in connection with reaching his or her decision if the arbitrator informs the parties of the use of such assistance and such persons agree to be bound by the provisions of this Canon.<br><br>C. It is not proper at any time for an arbitrator to inform anyone of any decision in advance of the time it is given to all parties. In a proceeding in which there is more than one arbitrator, it is not proper at any time for an arbitrator to inform anyone about the substance of the deliberations of the arbitrators. After an arbitration award has been made, it is not proper for an arbitrator to assist in proceedings to enforce or challenge the award." |

| | |
|---|---|
| **The Brazilian-American Chamber of Commerce, Arbitration Rules (2012)**, Articles 10, 14 | "10.7. None of the arbitrators, or the CAM-CCBC or the people connected to the Chamber, are liable to any persons for any acts, facts or omissions related to the arbitration."<br><br>"14.1.1. For the purposes of research and statistical surveys, the CAM-CCBC reserves the right to publish excerpts from the award, without mentioning the parties or allowing their identification.<br><br>14.2. Members of the CAM-CCBC, the arbitrators, the experts, the parties and others who participate are prohibited from disclosing any information to which they have had access as a result of their role or participation in the arbitration proceedings." |
| **Chartered Institute of Arbitrators Code of Professional and Ethical Conduct for Members (2009)**, Rule 8 | "A member [of the CIArb acting as an arbitrator] shall abide by the relationship of trust which exists between those involved in the dispute and (unless otherwise agreed by all the parties, or permitted or required by applicable law), both during and after completion of the dispute resolution process, shall not disclose or use any confidential information acquired in the course of or for the purposes of the process." |
| **Hong Kong International Arbitration Centre, Arbitration Rules (2013)**, Articles 42.4, 43 | "42.4 The deliberations of the arbitral tribunal are confidential."<br><br>"43.1 None of the Council of HKIAC nor any committee, sub-commitee or other body or person specifically designated by it to perform the functions referred to in these Rules, nor the Secretary General of HKIAC or other staff members of the Secretariat of HKIAC, the arbitral tribunal, any Emergency Arbitrator, tribunal-appointed expert or secretary of the arbitral tribunal shall be liable for any |

| | |
|---|---|
| | act or omission in connection with an arbitration conducted under these Rules, save where such act was done or omitted to be done dishonestly.<br><br>43.2  After the award has been made and the possibilities of correction, interpretation and additional awards referred to in Articles 37 to 39 have lapsed or been exhausted, neither HKIAC nor the arbitral tribunal, any Emergency Arbitrator, tribunal-appointed expert or secretary of the arbitral tribunal shall be under an obligation to make statements to any person about any matter concerning the arbitration, nor shall a party seek to make any of these persons a witness in any legal or other proceedings arising out of the arbitration." |
| **International Bar Association, Rules of Ethics for International Arbitrators (1987)**, Introductory Note, Article 9 | "The International Bar Association takes the position that (whatever may be the case in domestic arbitration) international arbitrators should in principle be granted immunity from suit under national laws, except in extreme cases of wilful or reckless disregard of their legal obligations. Accordingly, the International Bar Association wishes to make it clear that it is not the intention of these rules to create opportunities for aggrieved parties to sue international arbitrators in national courts."<br><br>. . .<br><br>"The deliberations of the arbitral tribunal, and the contents of the award itself, remain confidential in perpetuity unless the parties release the arbitrators from this obligation. An arbitrator should not participate in, or give any information for the purpose of assistance in, any proceedings to |

| | consider the award unless, exceptionally, he considers it his duty to disclose any material misconduct or fraud on the part of his fellow arbitrators." |
|---|---|
| **International Centre for Dispute Resolution, International Arbitration Rules (2014)**, Articles 37, 38 | "Confidential information disclosed during the arbitration by the parties or by witnesses shall not be divulged by an arbitrator or by the Administrator. Except as provided in Article 30, unless otherwise agreed by the parties or required by applicable law, the members of the arbitral tribunal and the Administrator shall keep confidential all matters relating to the arbitration or the award."<br><br>"The members of the arbitral tribunal, any emergency arbitrator appointed under Article 6, any consolidation arbitrator appointed under Article 8, and the Administrator shall not be liable to any party for any act or omission in connection with any arbitration under these Rules, except to the extent that such a limitation of liability is prohibited by applicable law. The parties agree that no arbitrator, emergency arbitrator, or consolidation arbitrator, nor the Administrator shall be under any obligation to make any statement about the arbitration, and no party shall seek to make any of these persons a party or witness in any judicial or other proceedings relating to the arbitration." |
| **International Centre for the Settlement of Investment Disputes, Rules of Procedure for Arbitration Proceedings**, Rules 6(2), 15 | "Before or at the first session of the Tribunal, each arbitrator shall sign a declaration in the following form:<br>. . .<br>'I shall keep confidential all information coming to my knowledge as a result of my participation in this proceeding, as well as the contents of any award made by the Tribunal.'" |

5

| | . . . |
|---|---|
| | "(1) The deliberations of the Tribunal shall take place in private and remain secret. |
| | (2) Only members of the Tribunal shall take part in its deliberations. No other person shall be admitted unless the Tribunal decides otherwise." |
| **International Court of Arbitration for the International Chamber of Commerce, Arbitration Rules (2012)**, Article 40 | "The arbitrators, any person appointed by the arbitral tribunal, the emergency arbitrator, the Court and its members, the ICC and its employees, and the ICC National Committees and Groups and their employees and representatives shall not be liable to any person for any act or omission in connection with the arbitration, except to the extent such limitation of liability is prohibited by applicable law." |
| **International Court of Justice, Rules of Court (1978)**, Article 21 | "1. The deliberations of the Court shall take place in private and remain secret. The Court may however at any time decide in respect of its deliberations on other than judicial matters to publish or allow publication of any part of them. |
| | 2. Only judges, and the assessors, if any, take part in the Court's judicial deliberations. The Registrar, or his deputy, and other members of the staff of the Registry as may be required shall be present. No other person shall be present except by permission of the Court. |
| | 3. The minutes of the Court's judicial deliberations shall record only the title or nature of the subjects or matters discussed, and the results of any vote taken. They shall not record any details of the discussions nor the views expressed, provided however that any judge is entitled to require that |

6

| | |
|---|---|
| | a statement made by him be inserted in the minutes." |
| **International Law Commission, Model Rules on Arbitral Procedure with a General Commentary (1958)**, Article 26 | "The deliberations of the tribunal shall remain secret." |
| **Iran-United States Claims Tribunal, Rules of Procedure (1983)**, Article 31, Note 2 | "The arbitral tribunal shall deliberate in private. Its deliberations shall be and remain secret. Only the members of the arbitral tribunal shall take part in the deliberations. The Secretary-General may be present. No other person may be admitted except by special decision of the arbitral tribunal. Any question which is to be voted upon shall be formulated in precise terms in English and Farsi and the text shall, if a member so requests, be distributed before the vote is taken. The minutes of the private sittings of the arbitral tribunal shall be secret." |
| **Permanent Court of Arbitration, Arbitration Rules (2012)**, Article 16 | "The parties waive, to the fullest extent permitted under the applicable law, any claim against the arbitrators and any person appointed by the arbitral tribunal based on any act or omission in connection with the arbitration." |
| **Singapore International Arbitration Centre, Arbitration Rules (2013)**, Article 34 | "34.1 SIAC, including the President, members of its Court, directors, officers, employees or any arbitrator, shall not be liable to any person for any negligence, act or omission in connection with any arbitration governed by these Rules.<br><br>34.2 SIAC, including the President, members of its Court, directors, officers, employees or any arbitrator, shall not be under any obligation to make any statement in connection with any arbitration governed by these Rules. No party shall seek to make the President, any member of the Court, director, officer, employee or arbitrator act as a witness in any legal |

| | proceedings in connection with any arbitration governed by these Rules." |
|---|---|
| **Stockholm Chamber of Commerce, Arbitration Rules (2010)**, Article 48 | "Neither the SCC nor the arbitrator(s) are liable to any party for any act or omission in connection with the arbitration unless such act or omission constitutes wilful misconduct or gross negligence." |
| **Swiss Rules of International Arbitration**, Article 44(2), Article 45 | "The deliberations of the arbitral tribunal are confidential."<br><br>. . .<br><br>"1. Neither the members of the board of directors of the Swiss Chambers' Arbitration Institution, the members of the Court and the Secretariat, the individual Chambers or their staff, the arbitrators, the tribunal-appointed experts, nor the secretary of the arbitral tribunal shall be liable for any act or omission in connection with an arbitration conducted under these Rules, except if the act or omission is shown to constitute intentional wrongdoing or gross negligence.<br><br>2. After the award or termination order has been made and the possibilities of correction, interpretation and additional awards referred to in Articles 35 to 37 have lapsed or have been exhausted, neither the members of the board of the Swiss Chambers' Arbitration Institution, the members of the Court and the Secretariat, the individual Chambers or their staff, the arbitrators, the tribunal-appointed experts, nor the secretary of the arbitral tribunal shall be under an obligation to make statements to any person about any matter concerning the arbitration. No party shall seek to make any of these persons a witness in any legal or other proceedings arising out of the arbitration. " |

8

| United Nations Commission on International Trade Law (UNCITRAL), Arbitration Rules (2010), Article 16 | "Save for intentional wrongdoing, the parties waive, to the fullest extent permitted under the applicable law, any claim against the arbitrators, the appointing authority and any person appointed by the arbitral tribunal based on any act or omission in connection with the arbitration." |
|---|---|
| World Intellectual Property Organization, WIPO Arbitration Rules (2016), Articles 78, 79 | "(a) Unless the parties agree otherwise, the Center and the arbitrator shall maintain the confidentiality of the arbitration, the award and, to the extent that they describe information that is not in the public domain, any documentary or other evidence disclosed during the arbitration, except to the extent necessary in connection with a court action relating to the award, or as otherwise required by law.<br><br>(b) Notwithstanding paragraph (a), the Center may include information concerning the arbitration in any aggregate statistical data that it publishes concerning its activities, provided that such information does not enable the parties or the particular circumstances of the dispute to be identified."<br><br>"Except in respect of deliberate wrongdoing, the arbitrator, WIPO and the Center shall not be liable to a party for any act or omission in connection with the arbitration." |
| World Trade Organization, Understanding on Rules and Procedures Governing the Settlement of Disputes, Article 14 | "1. Panel deliberations shall be confidential.<br><br>2. The reports of panels shall be drafted without the presence of the parties to the dispute in the light of the information provided and the statements made. |

| | 3. Opinions expressed in the panel report by individual panelists shall be anonymous." |
|---|---|