Case 1:16-mc-02552-BAH   Document 23-18   Filed 01/17/17   Page 1 of 21

In re Application Pursuant to 28 U.S.C. § 1782, Misc. Case No. 16-2552 (BAH)

# EXHIBIT R

Neutral Citation Number: [2014] EWHC 875 (Comm)

2013 Folios 731 and 935

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Rolls Building,
Fetter Lane, London, EC4A 1NL

Date: 02/04/2014

**Before**:

**THE HONOURABLE MR JUSTICE FLAUX**

- - - - - - - - - - - - - - - - - - - -

**IN THE MATTER OF THE ARBITRATION ACT 1996**

| | |
|---|---|
| **AND**<br><br>**IN THE MATTER OF AN ARBITRATION CLAIM** | **2013 Folio 731** |

**BETWEEN:**

| | | |
|---|---|---|
| | **LA SOCIÉTÉ POUR LA RECHERCHE, LA PRODUCTION, LE TRANSPORT, LA TRANSFORMATION ET LA COMMERCIALISATION DES HYDROCARBURES S.P.A ("SONATRACH")** | **Claimant** |
| | - and - | |
| | **STATOIL NATURAL GAS LLC ("STATOIL")** | **Defendant** |

| | |
|---|---|
| **AND**<br><br>**IN THE MATTER OF AN ARBITRATION CLAIM** | **2013 Folio 935** |

**BETWEEN:**

| | | |
|---|---|---|
| | **STATOIL** | **Claimant** |
| | -and- | |
| | **SONATRACH** | **Defendant** |

- - - - - - - - - - - - - - - - - - - -

**Hilary Heilbron QC and Alec Haydon** (instructed by **Messrs Stewarts Law LLP**) for **Sonatrach**
**Toby Landau QC and Jessica Wells** (instructed by **Messrs Hogan Lovells LLP**) for **Statoil**

Hearing date: 22nd March 2014

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................
THE HON MR JUSTICE FLAUX

**The Honourable Mr Justice Flaux:**

Introduction and background

1. The claimant in the application under section 68 of the Arbitration Act 1996 in 2013 Folio 731 is the Algerian state oil company, to which I will refer as "Sonatrach". The defendant (to which I will refer as "Statoil") is a subsidiary of the Norwegian oil company Statoil ASA, in which the Norwegian Government is the majority shareholder. Sonatrach's application is to set aside an arbitration award dated 30 April 2013 conducted under the auspices of the International Chamber of Commerce ("ICC") before three well-known Swiss and French jurists: Professor Pierre Tercier, Dr Wolfgang Peter and Professor Charles Jarrosson. Although arbitration hearings took place in Lausanne and Paris, the seat of the arbitration was London. Hence the English court is the supervisory court.

2. In addition to its section 68 application, Sonatrach seeks to set aside the Order of Cooke J dated 11 July 2013 in 2013 Folio 935, granting Statoil as claimant permission under section 66 of the Act to enforce the Award in the same manner as a judgment. In particular, Sonatrach seeks to contend that the Order for alternative service on Bredin Prat (the Paris lawyers who represented Sonatrach in the ICC arbitration) was defective and to set aside that part of the Order which required Sonatrach to pay Judgments Act interest on the outstanding amounts from the date of the Order.

3. The underlying dispute concerned Sonatrach's failure to comply with its obligations under four inter-connected contracts ("the 2008 Agreements") concluded on 1 March 2008 after more than twelve months of negotiations:

(1) A Framework Agreement dated 1 March 2008 governed by French law, and subject to ICC arbitration. It provided for, inter alia:

(a) The reservation by Statoil of a certain amount of firm transportation capacity on two of its pipeline systems in favour of Sonatrach; and

(b) The conclusion of heads of agreement ("HOAs") for the sale by Sonatrach and purchase by Statoil of liquefied natural gas ("LNG") between 1 April 2009 and 31 March 2024, including reservation of a guaranteed portion of Statoil's re-gasification capacity at Cove Point, such agreements being conditional upon the agreements reserving re-gasification and pipeline capacity. Provision was also made for a separate HOA regulating additional sales of LNG from Sonatrach to Statoil between 2009 and 2014.

(2) A HOA dated 1 March 2008 for the sale by Sonatrach and the purchase by Statoil of 72 million MMBtu of LNG per year between the first quarter of 2009 and 31 March 2024 ("HOA1").   This was also governed by French law and subject to ICC arbitration.

(3) A second HOA dated 1 March 2008, for the sale by Statoil and the purchase by Sonatrach between Q1 2009 and 31 March 2024 of a quantity of natural gas ("NG") equivalent to the quantity of LNG purchased by Statoil under HOA1 ("HOA2"). This was governed by the law of New York and subject to ICC arbitration.

(4) A third HOA dated 1 March 2008, for the sale of 36 million MMBtu of LNG per

year from Sonatrach to Statoil between Q1 2009 and 31 March 2014 ("HOA3"). This was governed by French law and subject to ICC arbitration.

4.      By HOA1 and HOA2, Sonatrach was to supply Statoil with LNG, which Statoil would then convert or "re-gasify" at the Cove Point facility into NG, and return to Sonatrach. Statoil would charge Sonatrach a fee ("Buyer's Cost") for the conversion of the LNG at the Cove Point facility and use of the pipeline to transport the LNG and NG. The sale and purchase of LNG under HOA3 was a 5 year supply agreement for LNG from Sonatrach to Statoil. This was essentially a renewal of earlier HOAs between the parties dating back a number of years. It was contemplated that the HOAs would be carried out through detailed agreements which the parties were obliged to enter into by the terms of the HOAs.

5.      In the event, Sonatrach failed to supply Statoil with any LNG under HOA3, failed to deliver any LNG or purchase any NG under HOA1 and HOA2 and failed to pay the "Buyer's Cost" under HOA1 and HOA2. Accordingly, Statoil issued a Request for Arbitration on 26 May 2010, claiming damages for breach of contract.   Sonatrach resisted Statoil's claim on a variety of grounds, all of which were rejected by the tribunal in its Award. For present purposes, the only ground which is relevant is the contention that the 2008 Agreements were not effective, because a condition precedent had not been fulfilled, namely the approval of the Algerian Government of either those Agreements or the detailed agreements.

6.      Sonatrach's Application Notice and Grounds and evidence in support relied upon, cumulatively, section 68 (2)(a), (b), (c) and (d) without particularising which specific head was relied upon in relation to each specific claim, a matter about which Mr Toby Landau QC for Statoil legitimately complained in his Skeleton Argument. However, in a Further Note provided by Miss Hilary Heilbron QC for Sonatrach on the day before the hearing, Miss Heilbron clarified that the application would be based only upon section 68(2)(a), alleged failure of the tribunal to comply with its general duty under section 33 of the Act.

7.      It is fair to say that the application as it was presented orally by Miss Heilbron QC was narrower and more focused than the Application Notice and Grounds of Challenge. So far as Ground 1 is concerned, the essence of the complaint is that (a) the tribunal overlooked a critical piece of evidence, exhibit R74, a letter from Mr Hanifi, the Director-General of Hydrocarbons of the Algerian Ministry of Energy and Mining ("MEM"), dated 2 February 2012 and (b) that the tribunal had mischaracterised the evidence of two of Statoil's witnesses Mr Gunnar Freberg and Mr Philippe Mathieu, in concluding that Statoil had received assurances from Sonatrach on the day the agreements were signed, 1 March 2008, that government approval had been obtained. Ground 2, the alleged improper use by the tribunal of an Administrative Secretary, was not the subject of any specific submissions by Miss Heilbron, although it was not formally abandoned.

Section 68 and the applicable legal principles

8. Section 68 of the Act 1996 provides, inter alia, as follows:

"68 Challenging the award: serious irregularity.

(1)A party to arbitral proceedings may (upon notice to the other parties and to the tribunal) apply to the court challenging an award in the proceedings on the ground of serious irregularity affecting the tribunal, the proceedings or the award.

A party may lose the right to object (see section 73) and the right to apply is subject to the restrictions in section 70(2) and (3).

(2)Serious irregularity means an irregularity of one or more of the following kinds which the court considers has caused or will cause substantial injustice to the applicant—

(a)failure by the tribunal to comply with section 33 (general duty of tribunal);

9.    Section 33 headed "General duty of the tribunal" provides as follows:

"(1)The tribunal shall—

(a)act fairly and impartially as between the parties, giving each party a reasonable opportunity of putting his case and dealing with that of his opponent, and

(b)adopt procedures suitable to the circumstances of the particular case, avoiding unnecessary delay or expense, so as to provide a fair means for the resolution of the matters falling to be determined.

(2)The tribunal shall comply with that general duty in conducting the arbitral proceedings, in its decisions on matters of procedure and evidence and in the exercise of all other powers conferred on it."

10.   Before considering the Award and Sonatrach's specific complaints about it in more detail, I should set out the legal principles applicable to section 68 applications, although these were (save on one issue) essentially common ground.

11. In order to succeed under section 68 an applicant needs to show three things.  First of all, a serious irregularity.  Secondly, a serious irregularity which falls within the closed list of categories in section 68(2).  Thirdly, that one or more of the irregularities identified caused or will cause the party substantial injustice. The focus of the enquiry under section 68 is due process, not the correctness of the tribunal's decision: see per Hamblen J in *Abuja International Hotels v Meridian SAS* [2012] EWHC 87 (Comm) at [48] to [49].  As the DAC Report states, and numerous cases since have reiterated, the section is designed as a long-stop available only in extreme cases where the tribunal has gone so wrong in its conduct of the arbitration that justice calls out for it to be corrected. This point, that section 68 is about whether there has been due process, not whether the tribunal "got it right", is of particular importance in the present case, where, upon close analysis, the claimants' real complaint is that they consider that the tribunal reached the wrong result, which is not a matter in relation to which an arbitration Award is

susceptible to challenge under section 68.

12.    It has been emphasised in a number of cases that the evaluation of the evidence is entirely a matter for the tribunal. A clear statement of the applicable principle can be found in the judgment of Colman J in *World Trade Corporation v C Czarnikow Sugar Ltd* [2005] 1 Lloyd's Rep 422 at [45], albeit in the context of section 68(2)(d), alleged failure to deal with an issue:

> "On analysis, these criticisms are all directed to asserting that the arbitrators misdirected themselves on the facts or drew from the primary facts unjustified inferences. Those facts are said to be material to an "issue", namely what were the terms of the oral agreement. However, each stage of the evidential analysis directed to the resolution of that issue was not an "issue" within Section 68(2)(d). It was merely a step in the evaluation of the evidence. That the arbitrators failed to take into account evidence or a document said to be relevant to that issue is not properly to be regarded as a failure to deal with an issue. It is, in truth, a criticism which goes no further than asserting that the arbitrators made mistakes in their findings of primary fact or drew from the primary facts unsustainable inferences."

13.    In the light of that statement, it might be thought that it should not be open to a party to a section 68 application to contend that the tribunal has disregarded or overlooked a particular piece of evidence since that amounts to an assertion that the arbitrators made mistakes in their findings of primary facts or drew unsustainable inferences from the primary facts which, as Colman J held, is not the basis for a challenge under section 68. However, Miss Heilbron QC relied upon a passage in the judgment of Toulson J (as he then was) in *Arduina Holdings BV v Celtic Resources Holdings Plc* [2006] EWHC 3155 (Comm), suggesting that, in an exceptional case, the court may interfere under section 68 where the tribunal has reached the wrong findings of fact.

14.    The relevant passage (underlined below) appears in a section of his judgment at [44]-[46] where the learned judge is setting out the applicable principles and emphasising that a remedy under section 68 is not available where the applicant contends a finding of fact is against the weight of the evidence:

> "44. Before coming to how the claim has been more fully developed, it is right to make a preliminary comment about the scope of section 68, although that ought not, by now, to be necessary. This court and higher courts have repeatedly stressed that section 68 is available only in extreme cases where the arbitral process has gone wrong in such an exceptional way that justice demands its correction. There is no need to cite authority for that proposition. The relevant authorities are, or ought to be, very well known.
>
> 45. The assertion in the claim form that the decision was contrary to the weight of the evidence does not begin to meet the requirements of section 68. If it were otherwise, then any appeal on grounds of fact could be brought under section 68. This would

be contrary to the whole scheme of the Act. There may be an appeal on points of law under section 69, with the leave of the court or agreement of the parties, but there is no appeal on questions of fact. Section 68, which does not require leave, is not intended to provide a backdoor route to appeals on fact.

46. <u>The assertion that the arbitrator failed to take any or proper consider[ation] of the evidence could, in an exceptional case, give rise to a challenge under section 68, based on the general duty of an arbitrator under section 33 if, for example, an arbitrator genuinely overlooked evidence that really mattered, or got the wrong end of the stick in misunderstanding it.</u> But there is all the difference in the world between such cases and an arbitrator evaluating evidence but reaching factual conclusions on it (as will happen in most arbitrations) which one party does not like. That cannot be the basis of a complaint under section 68."

15. Miss Heilbron also relied upon a passage in the summary of the applicable legal principles in the judgment of Akenhead J in *Schwebel v Schwebel* [2010] EWHC 3280 (TCC); [2011] 2 All ER (Comm) 1048 at [23(e)]:

"(e) It will be a very rare and exceptional case for the Court to interfere pursuant to Section 68 on the grounds that the arbitrator reached the wrong findings of fact, should have reached different factual conclusions, given greater weight to some evidence or failed to explain why weight or importance was not given to some evidence. It will be an even rarer case for the Court to find that even if there was some serious irregularity with regard to a failure to take into account evidence that there was substantial injustice, which is of course a precondition to the involvement of the court under Section 68, along with the need for there to be a serious irregularity."

16. This passage does not seem to me to provide any assistance to Sonatrach in the present case. It comes immediately after citation with approval of the passage from the judgment of Colman J in *World Trade Corporation* which I have cited above, and it is far from clear what rare and exceptional case Akenhead J may have had in mind. The passage from *Arduina* does not seem to have been cited, so it is difficult to see how this passage can be said to be supportive of the proposition that overlooking a piece of evidence can amount to a failure to comply with the general duty under section 33 such as to justify setting aside the Award under section 68(2)(a).

17. The passage from *Arduina* was cited by counsel for the applicant in *Petrochemical Industries Co v DowChemical Co* [2012] EWHC 2738 (Comm); [2012] 2 Lloyd's Rep 691 in support of a submission that the tribunal was in breach of the general duty under section 33 in overlooking a particular piece of evidence. Andrew Smith J was clearly unimpressed by the argument but felt constrained at [36] to follow the same approach as Toulson J:

"If the matter were free of authority, I would not have thought that a tribunal is in breach of the duty in sub-section 33(1)(a) (or

indeed that in sub-section 33(1)(b)) if it overlooks evidence (genuinely or otherwise). I would have interpreted the sub-section as being concerned with the even-handed conduct of the arbitral proceedings, and not with mistakes in evaluating the evidence by oversight or otherwise. I agree with Mr Smouha that this approach would sit comfortably with section 34 of the 1996 Act. Lord Grabiner argued that section 33(1) must be interpreted more widely in view of the description of it in sub-section 33(2) as a "general duty in conducting the arbitral proceedings", but I think that he places too much weight on these words. However, PIC's contrary view is supported by first instance decisions of Toulson J in *Arduina Holdings BV v Celtic Rersources Holdings plc*, [2006] EWHC 3155 at paragraph 46 and of Akenhead J in *Schwebel v Schwebel* [2010] EWHC 3280 (TCC) at paragraph 27. It suffices to cite what Toulson J said: [Andrew Smith J then cites the relevant passage]. In view of these precedents, at first instance I should adopt the same approach."

18.    I have to say that I am not sure I should feel similarly constrained. The passage in the judgment of Toulson J is clearly obiter since his conclusion (and thus the ratio of the decision) was that the applicant was engaged in an impermissible attack on the tribunal's findings of fact, so that the application under section 68 failed. Toulson J does not specify what sort of exceptional case he had in mind. I can quite see that in a case, for example, of an agreed or admitted piece of evidence which was ignored or overlooked, it might be possible to say that the tribunal was in breach of its duty under section 33, so that section 68(2)(a) was engaged. However, beyond that, it seems to me that, as the present case demonstrates, the contention that the tribunal has overlooked or misunderstood particular evidence necessarily involves interference with the evaluation of the evidence by the tribunal. Whilst the applicant may contend, as in the present case, that the tribunal has overlooked a critical piece of evidence, the tribunal may not have regarded it as critical and thus may have decided that it was not worth referring to in an Award which necessarily cannot set out every piece of evidence in the case. I do not see how the court can determine whether the tribunal has overlooked evidence without an analysis of the tribunal's evaluation of the evidence, which is not a permissible exercise under section 68: see the passage in the judgment of Colman J cited above and [49]-[50] in my own recent judgment in *Primera Maritime (Hellas) Limited v Jiangsu Eastern Heavy Industry Co Ltd* [2013] EWHC 3066 (Comm); [2014] 1 Lloyd's Rep 255 at 264-5, both cases under section 68(2)(d), but where the prohibition against attacking the findings of fact of the tribunal must apply whichever head of section 68(2) is relied upon.

19.    In the event, because for the reasons set out below, I do not consider that the tribunal did overlook or mischaracterise evidence, it is not necessary to decide whether and if so, to what extent, there is scope for interference under section 68(2)(a) in an exceptional case, as Toulson J suggests. On any view, this is not such an exceptional case.

The arbitration hearing and the Award

20.    The arbitration involved the exchange of hundreds of pages of written submissions. An oral hearing took place over four days from 11 to 14 April 2012 in Lausanne at which the

evidence was heard of eleven witnesses of fact and four experts. Extensive post-hearing briefs were exchanged on 1 June 2012. Thereafter, a further oral hearing took place in Paris on 29 June 2012 at which oral closing submissions were made by Maître Gouiffès of Hogan Lovells on behalf of Statoil and by Maître Delanoy of Bredin Prat on behalf of Sonatrach.

21.    Each of the HOAs contained the following condition precedent: "*This HOA shall be subject to both Parties' necessary Supervisory Board and Government approvals*". There was no corresponding provision in the detailed agreements. However, Sonatrach's case in the arbitration was that there was a "constant practice" since 1975 under which government approval is required for final and signed sales contracts because these have an impact on Algerian gas reserves which belong to the Algerian people, but not required for HOAs. Accordingly, Sonatrach's case was that this provision was referring not to government approval of the HOAs themselves but of the detailed agreements which would be made under them. Sonatrach contended both that such approval of the HOAs was not required and that it was not forthcoming. Furthermore, although it was anticipated government approval would be given to the detailed agreements, it was not forthcoming, so that the condition precedent was not fulfilled and Sonatrach was in breach of neither the HOAs nor the detailed agreements.

22.    Statoil's case is that the conditions precedent were clearly referring to approval of the HOAs themselves and, contrary to Sonatrach's contention, that approval had been given by the Algerian government. The detailed agreements did not contain any such condition precedent which reflected the contract structure that, once the HOAs were approved and became binding, Sonatrach was bound to enter into the detailed agreements and could not rely upon the excuse of absence of government approval. Accordingly, Sonatrach was in breach of contract in failing to fulfil the agreements.

23.    The tribunal decided in effect to determine the issue of the condition precedent as a preliminary issue before other issues, given that, as it recorded in [167] of the Award, it might considerably shorten its analysis. In [185] of the Award, the tribunal found that the agreements in the present case differed from previous gas sale and purchase agreements relied upon by Sonatrach in support of the constant practice, in that unlike in those agreements, there was no time frame after signature for the condition precedent to be fulfilled, nor any provision for the detailed agreements to be subject to a condition precedent of approval. The tribunal went on to find at [190] that the alleged constant practice did not apply to the detailed agreements in this case and at [197] that the condition precedent in the HOAs was referring to government approval of the HOAs, not of the detailed agreements.

24.    The tribunal then considered the question whether government approval had been given to the HOAs. At [198] it recorded that the essential terms of the 2008 Agreements had been agreed by the time of a meeting in London on 8 January 2008. The signing was not planned to take place until two months later on 1 March 2008. Statoil's evidence was that this gap was to give sufficient time for each party to obtain the necessary approvals. The tribunal found that explanation was plausible.

25.    The tribunal then went on to find at [199]-[201] that the Algerian government had in fact approved the terms of the HOAs prior to their signature on 1 March 2008. Since it is this

part of the Award which is subjected to criticism by Sonatrach in its section 68 application, it is appropriate to quote it in full:

> "199. On the signing date, a few moments before the signing ceremony, Claimant's and Respondent's representatives met (Freberg, Transcript 10.04.12, p. 179/9-10). Apart from the correction of a typographical error in the 2008 Agreements, Gunnar Freberg asked Othmane Irain "*whether everything was in place on their side*" (Freberg, Transcript 10.04.12, p. 181/14-15), a question which, according to Gunnar Freberg, referred to the necessary approvals (Freberg, Transcript 10.4.12, p. 181/15-16). Likewise, Philippe Mathieu declared that he inquired of Omar Maaliou whether Respondent had obtained the governmental approval:
>
> *"Q. Did you ever ask Mr Maaliou — or anyone else in Sonatrach — whether they had obtained the governmental approval that was referred to in the HOAs as signed?*
>
> *A. Yes.*
> *Q. At what time did you ask this?*
> *A. On the day of the signature.*"(Mathieu, Transcript 11.04.12, p. 115/4-9).
>
> The Arbitral Tribunal notes that, during his testimony, Omar Maaliou did not deny having had this discussion. Consequently, the Arbitral Tribunal finds it plausible that Claimant's representatives inquired of Respondent's representatives whether the governmental approval was obtained before signing the HOAs. As, according to French law the burden of proof is incumbent upon the debtor — here Sonatrach — Omar Maaliou should have, at least, clarified Respondent's position with respect to the governmental approval following the question asked by Claimant's representative (see Legal Opinion of Professor Delebecque of 2 November 2011, no. 50 with reference to Cass. 3rd civ. 10S.2008, Bull. Civ. III, no. 132). As a result of Respondent's omission, Claimant's representatives were entitled to believe that the HOAs had been approved, which they also seem to have believed (see Exh. C-73).
>
> Based on the above, the Arbitral Tribunal finds that the discussions between the Parties' representatives demonstrate that the HOAs of 2008 had been approved.
>
>
> 200. Furthermore, it is undisputed that the signing ceremony of the HOAs took place on 1 March 2008 and was reported by the media. The 2008 Agreements were characterised as "*an agreement sealing a long-term partnership*" (Exh. C-46). Their duration was also explicitly mentioned by the media ("*capacité de regazéfication [...] pour une durée de quinze ans à partir de 2009*": Exh. C-46).
>
> As to the participants at the ceremony, the Minister for Energy and Mines had been invited to attend the signing ceremony, but

declined at the last moment because of other commitments (Maaliou, Transcript 11.04.12, p. 202/4-10). In addition, in his speech at the signing ceremony, Mohamed Meziane, Sonatrach's President, stressed the following: "*nous ne ménagerons aucun effort pour leur mise en oeuvre et pour assurer de notre soutien les équipes chargées de leur application*" (Exh. C-8).

It appears thus, based on the above considerations, that the Algerian government, which was not only informed about the signing of the HOAs but also invited to attend the signing ceremony, did not object to them. Besides, the file does not contain any evidence to prove a refusal of the governmental approval.

201. It is true that Respondent did not formally comply with the process for obtaining governmental approval as described by Respondent's witness (see Maaliou, Transcript 11.04.12, p. 200/15-25 and p. 201/1-8). However, under the circumstances as set out above, the Arbitral Tribunal, considering the lack of legal basis or any written document describing the process of governmental approval as well as the absence of a time-frame during which the approval should have been given, finds, from a material point of view, that the Algerian government actually approved the HOAs."

26.    The tribunal concluded at [204] and [207] that this approval related to the "package" as a whole, in other words the HOAs and the detailed agreements that would follow and that there was thus a commitment relating to the allocation of Algerian natural resources at the time of signature of the 2008 Agreements. At [208] the tribunal found that conclusion was demonstrated by (a) the regular transmission thereafter of information about the HOAs to the MEM, including informal discussions with the Minister and (b) Sonatrach's effort to meet the commitment contained in the HOAs. While negotiating the detailed agreements, Sonatrach excused its default in gas delivery in March 2009 by invoking production restraints. As the tribunal remarked: "this would not have been necessary if the commitment to allocate Algerian resources had not been made by signing the HOAs". The tribunal then went on to find at [209] that there was no discussion whatsoever between the parties of government approval from the date of signature until Sonatrach raised the matter on 5 October 2009 at a meeting in Buenos Aires. Finally the tribunal concluded at [221] that as a result of the government approval of the HOAs signed in 2008, there was no need to approve the detailed agreements.

27.    The findings referred to in the previous paragraph are important, because they demonstrate that, contrary to Sonatrach's submissions to the Court, there was other evidence beyond the oral evidence referred to in [199] from which the tribunal was entitled to infer that the Algerian government had approved the HOAs and the package as a whole.

Ground 1 of the application

28.    As the first ground of the application under section 68 was presented by Miss Heilbron

QC at the hearing, it was essentially limited to two criticisms: (i) that the tribunal overlooked the letter of 2 February 2012 from M Hanifi in concluding, in particular at the end of [200] that there was no evidence to prove a refusal of the government approval; (ii) that in [199] the tribunal had mischaracterised the evidence of Mr Freberg and Mr Mathieu of Statoil. Miss Heilbron submitted that Sonatrach was entitled to have the letter, which she categorised as a crucial piece of evidence, dealt with by the tribunal and that it was entitled to have findings of fact made by the tribunal on the basis of the evidence before it, not by mischaracterisation of the evidence. She submitted that those failures by the tribunal amounted to serious irregularity within section 68(2)(a). In that regard, as I have already said, Miss Heilbron relied upon what Toulson J said in *Arduina* quoted above. I have expressed my doubts as to whether such a challenge to the evaluation of the evidence by the tribunal and to its findings of fact can, as a matter of law, amount to a serious irregularity within section 68(2), but, in my judgment, the criticisms Sonatrach makes fail as a matter of fact whatever legal obstacle Sonatrach faces.

29.     The letter dated 2 February 2012 from the Director-General of Hydrocarbons of the MEM, M Hanifi, was written to Mme Y Hamdi Sonatrach's Vice-President of Marketing. It read in translation from the French, as follows:

> "At your request, and in the frame of the dispute which is currently pending between SONATRACH and STATOIL NATURAL GAS LLC before an international arbitral tribunal, we officially confirm the following:
>
> Although this is not prescribed by any legal provision, all of SONATRACH's export contracts for the sale of natural gas or liquefied natural gas of a duration of 5 years and more are submitted for review to the services of the Ministry in charge of Energy after their signature between SONATRACH and its clients, and do not enter into force before they have been approved in writing by the Ministry at the end of this review. The Ministry deems that no mid-term or long-term export of Algerian natural gas can validly take place in the absence of such an approval.
>
> Although the Ministry is normally informed by SONATRACH of the contents of the Heads of Agreement it enters into from time to time with its clients these agreements are not submitted for review and approval to the Ministry to the extent that they do not generate themselves any export of gas.
>
> Concerning the Heads of Agreement entered into between SONATRACH and STATOIL on March 1st, 2008, attached, these agreements have not been submitted for review and approval to the Ministry by SONATRACH, either before or after their signature.
>
> In the case where SONATRACH would have requested the approval of these agreements by the Ministry, which would have been unprecedented, the Ministry would have conditioned this approval to the review of the contracts provided for in these agreements, after their signature, since they were mid-term or long-term export gas contracts, as it does for all the contracts of this kind.
>
> We authorize you to produce the present letter before the aforementioned arbitral tribunal."

30.     Miss Heilbron emphasised in particular the third paragraph of the letter. She submitted

that here was an official letter from a sovereign government which was crucial evidence that government approval of the HOAs had not been forthcoming. The letter was not referred to anywhere in the 159 page Award and so must have been overlooked.

31.     Mr Toby Landau QC for Statoil submitted that the letter, produced at Sonatrach's request two months before the first round of oral hearings before the tribunal, was self-serving, but, in any event, it was addressing Sonatrach's case that there was a constant practice of approval of mid- and long-term gas sale and purchase agreements (i.e detailed agreements) in the form of notification in writing of the government approval after execution of the relevant detailed agreements and that (i) that practice did not apply to the HOAs and (ii) that process of formal approval was not carried out here. This was the case summarised at [169] to [172] of the Award.

32.     I agree with Mr Landau that it is this formal requirement of MEM approval of mid- and long-term gas sale and purchase agreements and the constant practice alleged by Sonatrach to apply here (so that it was the detailed agreements and not the HOAs which required approval) which the letter is addressing. Furthermore, it is in that context that Maître Delanoy deployed the letter in his questions of both the experts on French law in the "hot-tubbing" session on 12 April 2012. Having read the letter and stated that it was an affidavit of the Government which nobody had said was a lie, he asked this:

> "Now, supposing it isn't a lie but it is true, I ask the question of both of you…the fact that the ministry states …they had to ask the ministry, they said, 'if you had submitted to us the HOAs, it isn't in conformity with Algerian practice, I would have asked you to resubmit them once you had worked out the final contract' should that element be taken into account by the ...tribunal or not?"

33.     That Statoil's expert Professor Delebecque understood that Maître Delanoy was relying on the letter in support of Sonatrach's case that the constant practice applied in the present case is apparent from his answer:

> "Should it be taken into account? Well it's an official exhibit of the Algerian state. Of course you have to review it, obviously. Now, how should we understand the answer? Well, I read that the condition is stipulated in the HOAs, it is not stipulated in the detailed contracts. I think what prevails is the wish of the parties."

34.     There then ensued a discussion between the lawyers and the tribunal about the status of the letter, as to whether it was appropriate to ask the experts about it. The Chairman of the tribunal referred to the difficulty of differentiating between questioning and pleading and to each party bringing one or two documents to the attention of the tribunal to make sure it didn't miss the document but he was clearly of the view this was not for the experts. It was this which seems to have provoked what Maître Delanoy said at the end of this line of questioning of the experts, evidently directed at the tribunal, or at least the Chairman: "…why this exhibit doesn't please you, I don't know why it is the case. It doesn't seem to be acceptable to you. But anyway, I shall close it" to which the Chairman's response was "The tribunal will judge that. Could you ask your question?" Maître Delanoy then asked more questions evidently designed to establish the constant

practice but the Chairman stopped him on the basis this was pleading which did not have to be explored with the experts.

35.    In Sonatrach's Post-Hearing Brief, Maître Delanoy again relied upon the letter in support of the case that the practice applied, that it was the detailed agreements and not the HOAs which required government approval and that the Algerian government did not approve HOAs. He submitted at [97] that the tribunal must accept this "official affidavit… because it is true and consistent with a long-standing practice." In his oral closing submissions Maître Gouiffès referred to the letter as a self-serving document produced two months before the Lausanne hearing, contradicted by the contemporaneous evidence in March 2008 of Sonatrach representatives saying there was no problem (evidently a reference to what Mr Freberg and Mr Mathieu say they were told) and that the Minister was due to attend the signing ceremony.  In his oral closing submissions Maître Delanoy denied that the letter was a self-serving deceptive affidavit and said that "we asked for a confirmation of the practice, and it has been confirmed as it is", a further indication that the letter was being relied upon by Sonatrach in support of the constant practice and its application in the present case.

36.    In my judgment, the letter was dealing with the constant practice and the formal process of approval to which detailed agreements were normally subjected. It was not addressing at all and therefore did not contradict the matters from which the tribunal was entitled to infer and did infer that the Minister had approved the HOAs in the present case: that two months was allowed to obtain approval, that the Minister was due to attend the signing ceremony, that the representatives of Statoil were given to understand immediately before signing that approval had been given and that for a period of more than a year after signature there were discussions with the MEM about the HOAs. To the extent those matters did not emerge until the Lausanne hearings (for example the evidence of Mr Freberg and Mr Mathieu) after the letter was produced, it would have been open to Sonatrach to produce another letter from MEM contradicting those matters, but tellingly it did not do so.

37.    Because the letter was directed at the practice and because the tribunal held that, whilst the practice may have existed it did not apply in the present case given the express terms of the HOAs and the detailed agreements (see [190] and [197] of the Award), I agree with Mr Landau that this is not a case of the tribunal having overlooked a crucial piece of evidence which contradicted the matters from which the tribunal was entitled to infer the Minister had approved the HOAs. The letter was simply not relevant once the tribunal held that the constant practice did not apply in the present case. Furthermore, the condition precedent simply did not prescribe that there had to be some formal process of approval such as the letter describes.

38.    Even if that were wrong and the letter were of some relevance, it was entirely a matter for the tribunal what weight it gave to it. It is evident from the exchange with Maître Delanoy that the tribunal did not think much of the letter, which no doubt explains why it did not refer to it in the Award.  However, it is a very long way from there to concluding the tribunal overlooked it, especially when at [158] of the Award, the tribunal says in terms: "The …tribunal has examined carefully all factual and legal arguments by the parties even if some of them are not specifically mentioned below in this Award". It is far more likely that the tribunal did not refer specifically to the letter because it did not

consider the letter of any weight than that the tribunal overlooked it.

39. In relation to the evidence of Mr Mathieu and Mr Freberg, Sonatrach contends that the tribunal has mischaracterised their evidence. In relation to Mr Mathieu the mischaracterisation is said to be that the tribunal, having quoted the passage at [199], characterised that as being evidence that Mr Mathieu was told by Mr Maaliou of Sonatrach on 1 March 2008, before the 2008 Agreements were signed, that Sonatrach had obtained government approval, whereas the tribunal had failed to refer to a passage in his evidence about ten minutes later where in answer to Dr Peter he said he could not remember who at Sonatrach had given him the confirmation, thereby contradicting himself. In my judgment this criticism is unfair both to Mr Mathieu and to the tribunal. What Maître Delanoy actually asked him is whether Mr Maaliou or anyone else at Sonatrach had given the confirmation and it is that to which he answered yes, so there is no question of him contradicting himself. He did not remember who gave the confirmation (which is scarcely surprising after four years) but since it was evidently Mr Maaliou with whom he had closest contact during negotiations and he also said in answer to Dr Peter that another colleague got confirmation from other people (evidently a reference to the discussion between Mr Freberg and Mr Irain), the tribunal would have been entitled to infer that, in all probability, it was Mr Maaliou who gave Mr Mathieu the confirmation. In any event, whoever gave the confirmation, Mr Mathieu's clear evidence was that he was told by a representative of Sonatrach that the government approval had been given, he thought at a meeting of its top management and executive committee the previous day.

40. Sonatrach also sought to criticise what the tribunal said about Mr Maaliou not having denied that discussion in his evidence, but in my judgment there is simply nothing in that criticism. By the time Mr Maaliou gave evidence, Maître Delanoy was well aware that Mr Mathieu's evidence was that a representative of Sonatrach had confirmed that approval had been given and he must surely have appreciated, given his own line of questioning of Mr Mathieu, that it was highly probable that it was Mr Maaliou. One would have expected Sonatrach's lawyers to check with their client and, specifically, the witnesses who had been at the signing, who included Mr Maaliou, whether or not they accepted that confirmation had been given and, if they did not, to adduce evidence to that effect. Even if one assumes that, for some reason Maître Delanoy overlooked this point at the time, by the end of the arbitration, he must have appreciated what Statoil was contending about confirmation having been given at the signing meeting, since this was abundantly clear from Maître Gouiffès' closing submissions. If he had wanted to call further evidence to contradict that point, he had the opportunity before the arbitration hearing was formally closed to make an application to do so. Not having done so, it is not now open to Sonatrach to complain about the tribunal's findings in [199] of the Award.

41. Sonatrach's case at the hearing in relation to the evidence of Mr Freberg came down to the suggestion that the tribunal had mischaracterised his evidence because his actual evidence was vague and he did not say what Mr Irain's answer to his question had been. In my judgment this point is both unfair and misconceived. In his evidence Mr Freberg, like Mr Mathieu, referred to the two month period between the end of negotiations and signing being for the approvals to be obtained.  He also referred to there having been a meeting of the relevant committee of Sonatrach to approve the contracts just prior to the signing. He went on to give this evidence in answer to questions from the tribunal:

" A. On the date of the signing, I asked Mr Irain, who was basically the guy I talked to during the negotiations, exchanged emails and so forth, whether everything was in place on their side. And I also acknowledged that we had the approval from our executive committee.

THE CHAIRMAN You well remember this answer?

A. Yes, because we discussed this due to the fact that at the last minute there was a typographical error that was corrected just before the signing, at the site.

THE CHAIRMAN Tell me again the relation between the typo and the governmental approval.

A. No, there was no relation. But then we said, "Is everything ok now?" It was very clearly expressed."

42.    Contrary to Sonatrach's submissions, that evidence demonstrates both that Mr Irain understood from the context that Mr Freberg was asking about government approval and that Mr Irain did provide an affirmative assurance to Mr Freberg. There is no question of the tribunal having mischaracterised the evidence in [199] of the Award.

43.    In her Skeleton Argument Miss Heilbron complained that this evidence only emerged during Mr Freberg's oral testimony and was not foreshadowed in his witness statements, so that Sonatrach could not deal with the allegation because Mr Irain was not a witness at the hearing. In fact, Mr Irain had left Sonatrach to go to another employer which had a business relationship with Statoil and so did not want him to give evidence for Sonatrach. However, he was apparently working in London, so that, if Maître Delanoy had wanted to, when this evidence emerged, he could have reserved Sonatrach's position and sought the permission of the tribunal to obtain a witness summons from the court to compel Mr Irain's attendance under section 43 of the Arbitration Act 1996. For whatever reason, he chose not to do so, but the consequences of that decision cannot be laid at the door of the tribunal. There is no question of any absence of due process here.

44.    Not only did the tribunal not mischaracterise the evidence of Mr Freberg and Mr Mathieu, but, contrary to Sonatrach's submissions, this evidence about Statoil having received assurances from Sonatrach that government approval had been given was not the only evidence available to the tribunal from which it was entitled to conclude that government approval had been given. In particular, there was the evidence that the Minister was due to attend the signing ceremony and only failed to do so because he had another commitment. Mr Meziane, the President Director-General of Sonatrach clearly expected the Minister to be there, as he had prepared his speech for the signing ceremony which was published on the internet, thanking the Minister for "the added importance his presence brings to these agreements". In the circumstances, since the Minister was due to be there right up until the last minute and his absence was happenstance rather than anything sinister, it seems to me it would be nigh on impossible for the Minister to say he had not approved the 2008 Agreements. After all, the HOAs did not prescribe that the approval had to take any particular form. In my judgment, there was ample evidence from which the tribunal was entitled to conclude that government

approval had been given and the condition precedent satisfied.

45.    The reality is that this is yet another case, of which there are already far too many (*Primera Maritime* being the most recent) where a party is seeking to use section 68 to challenge findings of fact made by the tribunal. As I said at [50] of my judgment in that case:

> "It is clearly not appropriate to use an application under section 68 to challenge the findings of fact made by the tribunal. If it were otherwise every disappointed party could say it had been treated unfairly by pointing to some piece of evidence in its favour which was not referred to in the Reasons or not given the weight it feels it should have been. That is precisely the situation in which the Court should not intervene. Matters of fact and evaluation of the evidence are for the arbitrators."

Ground 2

46.    The second ground of challenge to the Award under section 68 is that the tribunal improperly delegated authority to its administrative secretary or impermissibly allowed her to participate in its deliberations. As I have said, Sonatrach did not advance any submissions on this point at the hearing but did not formally abandon it. In fact it amounts to a very serious allegation which is completely without merit and which should never have been made.

47.    In his letter to the parties of 17 January 2011, the Chairman of the tribunal made it clear that the tribunal wished to use an administrative secretary, Ms Anna Noël, including to prepare documents useful to the tribunal's decision:

> "The Arbitral Tribunal would be glad to count on the assistance of an Administrative Secretary. The status of the Administrative Secretary will only consist in assisting the Tribunal and its Chairman in the administrative tasks for the proceedings, the organization of the hearings and the preparation of documents that may be useful for the decision. In no way the Administrative Secretary will have the right to participate in the decision."

48.    The Chairman invited the parties to confirm by 28 January 2011 whether they had any objection to the appointment of Ms Noël. No objection was raised. Furthermore, it is standard practice in ICC arbitrations for administrative secretaries to be used and for them to produce notes to assist the tribunal. Sonatrach complains that Ms Noël produced three notes for the tribunal on the subjects of Government approval, HOAs and damages and that such activity cannot be described as administrative. On 8 November 2012, Maitre Delanoy raised a query with the tribunal about Ms Noël's third invoice which raised charges for the preparation of these notes. He asked to see the notes. In its response on 12 November 2012, the tribunal declined to produce them, on the basis that to do so would violate the secrecy of the tribunal's deliberations. However, the Chairman confirmed that Ms Noël had not exceeded her tasks as described in his letter of 17 January 2011.

49.  Frankly, that should have been an end of the matter and Sonatrach should have accepted the Chairman's word. However, Sonatrach persisted with its complaint in its section 68 application, contending that there was an inconsistency between the Chairman's reference to the secrecy of deliberations, and Ms Noël not exceeding the agreed remit, in other words that she must have participated in the deliberations. I agree with Mr Landau that there is no such inconsistency. The Chairman was not saying that she had participated in the tribunal's deliberations, just that the notes formed part of the tribunal's deliberations, which are secret. As *Fouchard Gaillard Goldman on International Commercial Arbitration* state at [1374]:

> "Although, again, most laws do not explicitly require deliberations in international commercial arbitration to be secret, such secrecy is generally considered to be the rule."

50.  Furthermore, the Chairman was not indicating that the tribunal had in any sense delegated its functions to Ms Noël. As Mr Landau points out, Sonatrach does not allege, having seen her invoices, that she has charged any time for participating in deliberations. Sonatrach's case at [31] of its Grounds of Challenge that: "in the absence of the notes, there is a prima facie inference, when coupled with the description of the work undertaken, that contrary to the Chairman's statement, the remit has been exceeded" is wholly without merit.

Challenges to the Order of Cooke J

51.  Sonatrach seeks to challenge the Order of Cooke J of 11 July 2013 in two respects. First, it contends that the Order for alternative service on Bredin Prat under CPR 6.15 under [7] of the Order should not have been made, because no "good reason" for alternative service was shown by Statoil on its application under section 66 and, indeed, no reason at all was given why it was not possible to serve Sonatrach personally under CPR 62.18(7) which applies to an Order for enforcement. This may well be right, but ultimately, this is a non-point, since Miss Heilbron accepted that the recent decision of the Supreme Court in *Abela v Baadarani* [2013] UKSC 44; [2013] 1 WLR 2043 indicated that CPR 6.15(2) can be used retrospectively to validate alternative service. The evidence now before the Court is that there is no bilateral service treaty with Algeria and the information from the Foreign and Commonwealth Office is that if service in Algeria is possible at all, which is not certain, it would take at least a year. In the circumstances, an Order for alternative service on Bredin Prat was clearly appropriate and, to the extent necessary, I will validate the Order made on 11 July 2013 retrospectively.

52.  The second challenge concerns [6] of the Order of Cooke J which awards interest at 8% (i.e under the Judgments Act 1838) on the outstanding damages and costs awarded by the tribunal from the date of the Order until payment. Miss Heilbron points out that no pre- or post-Award interest was awarded by the tribunal and in fact, no claim was pleaded for post-award interest. In those circumstances, she relied upon the decision of Aikens J (as he then was) in *Walker v Rome* [1999] 2 All ER (Comm) 961. In that case, the arbitrators had not awarded post-award interest under section 49(4) of the Arbitration Act 1996. The learned judge declined to award interest under section 35A of the Supreme Court Act 1981 or under section 66 of the Arbitration Act saying at 967g-h:

"Section 66 of the 1996 Act enables the court to embody an award made by the tribunal in a judgment of the court. But it does not empower the court to add an extra judgment for post-award interest when the arbitrators have not made such an award under s. 49(4). Any attempt by the court to add a judgment for interest would be an intervention by the court and contrary to the terms of s. 49(4) and so would infringe the principle set out in s. 1(c) of the 1996 Act."

53.     As the learned judge pointed out (at 967e-f) the statutory regime under section 49(4) of the 1996 Act marked a change from the position under the Arbitration Act 1950, where once an award was made, interest post-award was added to it automatically under section 20. However, it is important to note that was a case where the court was being asked to award interest post-award but pre-judgment. The position is different where the court has made an Order under section 66 of the Arbitration Act giving permission to enforce an award as a judgment of the court and is then asked to award interest from the date of the Order under the Judgments Act 1838. This distinction was recognised by Aikens J himself at 965g-h where he said:

"I pointed out that once the costs award had been made a judgment of the court, then s. 35A of the 1981 Act could not apply to the period after the judgment had been entered. If interest was payable at all after the date of the judgment, then it would be payable under the Judgment Act 1838 as modified by s. 44 of the Administration of Justice Act 1970 ."

54.     Aikens J made the same point in *Pirtek (UK) Ltd v Deanswood Ltd* [2005] EWHC 2301 (Comm); [2005] 2 Lloyd's Rep 728 a case where the court held an arbitrator had had no jurisdiction to make an award of interest in respect of a previous award he had made where interest had not been awarded. Having referred at [20] to the change of statutory regime which he had analysed in *Walker v Rome* and to the importance of a party who wanted post-award interest applying under section 49(4) Aikens J said at [47]:

"…the difficulty could have been avoided by a much earlier application to make the Award a judgment. Judgment Act interest would then have run on the sum awarded. There is no explanation as to why that was not done."

55.     Once judgment on an award has been entered under section 66 of the Arbitration Act (or under section 101(2) in the case of a foreign New York Convention award), that judgment has the same characteristics as any other judgment of the court and interest will run under the Judgments Act from the date of the judgment. That is the interest which Cooke J awarded here. Miss Heilbron sought to suggest that there was some tension between section 49(4) and section 66 or between section 49(4) and the Judgments Act 1838 as amended by the Administration of Justice Act 1970. However, I do not consider there is any such tension. Once a judgment is entered under section 66, a different regime to that of the arbitration itself applies, since the obligation to honour the award merges into a judgment debt which carries interest at 8% under the Judgments Act. This was a point made by Kerr J (as he then was) in *Dalmia v National Bank* [1978] 2 Lloyd's Rep 223 at 275 lhc.

56.     The same point was made in a modern context by Beatson J (as he then was) in *Gater Assets Ltd v Nak Naftogaz (No. 2)* [2008] EWHC 1108 (Comm); [2009] 1 All ER (Comm) 667, a case of enforcement of a New York Convention award under section 101(2), at [23]-[24]:

> "23...an award may either be enforced "in the same manner as a judgment" (see sections 66(1) and 101(2) of the 1996 Act) or "judgment may be entered in terms of the award" (sections 66(2) and 101(3)). The leave of the court to enforce "in the same manner as a judgment" is a prerequisite of the power to enter judgment in terms of the award, but the two are separate. The essential difference is that the obligation to honour an award arises by virtue of the agreement of the parties, whereas in the case of a judgment it follows from the power of the court. This difference is reflected in the approach of Aikens J in two cases. He proceeded on the basis that the entering of a judgment changes the position. *Walker v Rome* [2000] 1 Lloyd's Rep 116 at [13]–[14], relied on by Mr Higham, in fact concerned the post award but pre-judgment phase and it appears (see [14]) that Aikens J considered that the position would be different once judgment was entered. In *Pirtek v Deanswood* [2005] 2 Lloyds Rep 728 his Lordship stated (at [47]) that the difficulty that arose in that case, where the award had not included interest and the arbitrator sought to do so by a retrospective order, "could have been avoided by a much earlier application to make the award a judgment. Judgment Act interest would then have run on the sum awarded".

> 24 In *Walker v Rome* Aikens J said he was driven to his conclusion by the wording of the 1996 Act. He stated [at 17(6)] that it was the combined effect of sections 1(c), 49 and 66 which had this effect but it is clear that the key provision was section 49 : see [17(1) and (4)]. There is no equivalent of section 49 applicable to New York Convention awards. Moreover, here unlike *Walker v Rome* the award has been entered as a judgment. Accordingly, I am not driven to a result which would have the effect of enabling a judgment debtor to delay without financial penalty paying his judgment debt and reduce the real value of the judgment."

57.     In the present case, Cooke J made an Order enforcing the Award as a judgment under section 66 and, quite correctly, awarded interest on the sums awarded by that judgment at 8% under the Judgments Act 1838 from the date of the judgment until payment. Once a judgment is entered, contrary to Miss Heilbron's submission, there is no tension with section 49(4), which is simply irrelevant. Sonatrach's challenge to this part of the Order of Cooke J is misconceived.

Conclusion

58.     Sonatrach's application to set aside the Award for serious irregularity under section 68 of the Arbitration Act 1996 is dismissed, as is its challenge to [6] of the Order of Cooke J of

11 July 2013. The alternative service on Bredin Prat under [7] of that Order is retrospectively validated pursuant to CPR 6.15(2).